FILED
5/5/20 1:46 pm
CLERK
U.S. BANKRUPTCY
COURT - WDPA

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IN RE:

| | | |
|---|---|---|
| JOHN H. KENT, | : | Case No. 18-10620-TA |
| *Debtor* | : | |
| | : | Chapter 13 |
| JOHN H. KENT, | : | |
| *Plaintiff* | : | Adversary No. 19-01022-TA |
| | : | |
| v. | : | Related to Doc No. 1 |
| | : | |
| SKODA MINOTTI & CO., CERTIFIED | : | |
| CERTIFIED PUBLIC ACCOUNTANTS,: | | |
| and LAURA J. PAGE, | : | |
| *Defendant*s | | |

## <u>MEMORANDUM OPINION</u>

*Appearances:*    Brian C. Thompson, Esq., for the Plaintiff
             Matthew Pomy, Esq., for the Defendants

Debtor, John J. Kent, filed a 4-count **Complaint** against the Defendants related to a

pre-petition contract to provide him with certain accounting services.[1] For the reasons that follow,

the Court will find in favor of the Defendants on the merits with respect to the breach of contract

count. Two other related counts for unjust enrichment and conversion will be dismissed on the basis

that they cannot be maintained because they have the same factual basis as the breach of contract

---

[1]
    This adversary proceeding is a core matter pursuant to *28 U.S.C. §157(b)(2)(E)*. The Court
has subject matter jurisdiction pursuant to *28 U.S.C. §§157* and *1334*. All Parties have consented
to the entry of final orders and judgments by the Court. *See*, *Complaint* at ¶2, Doc No. 1 and
Answer at ¶2, Doc. No. 6. This *Memorandum Opinion* constitutes the Court's findings of fact and
conclusions of law under *Fed.R.Bankr.P. 7052*.

claim.  As to the final count, for turnover under *11 U.S.C. §542(e)*, the Court will find in favor of

the Debtor and order the turnover of work product that was created as part of the contract.

## *FACTS*

The Debtor filed this Chapter 13 case on June 21, 2018, and he then filed this

adversary proceeding on May 15, 2019.  Debtor is the sole proprietor owner and operator of a

business known as KB Directional that provides directional drilling services on a contract basis for

utility companies.  This would include such things as underground gas, water, and cable system

projects.  Debtor has been engaged in this business for almost 20 years.

The Debtor was formerly married to Katie Kent ("Wife").  For a long time, Wife

acted as the secretary and bookkeeper for the Debtor's business.  She would do this from the

couples' home while Debtor spent most of his time on the road traveling to and working on various

jobs.  Beginning around the fall of 2016, the Debtor began thinking about the possibility of

separating from Wife and seeking a divorce.  The Debtor contacted Paul Etzler ("Etzler"), a partner

at the Skoda Minotti & Co. ("Skoda") accounting firm from Ohio, whom he had met a number of

years earlier in connection with an accounting issue involving KB Directional.  Debtor considered

Etzler somewhat of a friend and wanted to discuss various issues with him related to the potential

 divorce and how it might affect the business and its assets.  The Skoda billing records indicate that

this initial discussion took place on October 25, 2016, and lasted one hour.  No fee agreement was

signed at the time and Etzler did not then bill the Debtor for his time.

The Debtor actually separated from Wife in March 2017 and had the mail delivery for the business re-routed to come directly to him rather than to Wife.  Wife's involvement with the business ceased at that point and the Debtor's mother, Karen Kent ("Mrs. Kent"), stepped in to take over the same role in the business that Wife had formerly performed.

Once the Debtor began to receive the mail for the business he testified that he discovered that Wife may not have been paying taxes or filing tax returns for a number of years prior to the separation, and he realized he was facing a problem.  The Debtor therefore contacted Etzler again sometime in March 2017.  According to the Skoda billing records the next communication between the Debtor and Etzler was on March 31, 2017, on which date they had a 2.5 hour discussion[2] according to the Skoda billing records.  The Debtor informed Etzler that a divorce action had been filed, and asked Etzler for advice about how that  might affect his business operation and taxes, and what he should be doing to protect his assets.  Etzler gave him some general advice in a number of discussions.

Etzler, who described his accounting practice as being equivalent to what a low-level CFO would do, originally thought that the accounting work that Debtor needed would be something that he (Etzler) could handle himself.  However, as his discussions with Debtor continued, Etzler realized that the Debtor would need assistance in completely recreating financial records from 2011 forward, and preparing and filing tax returns for that same time period – areas beyond Etzler's

---

[2]

Etzler testified that he did not keep track of his time for billing purposes for the first couple of weeks that he resumed talking with the Debtor in March 2017, so it is possible the communication between Etzler and the Debtor actually resumed around mid-March.  In any event, that point is not material to the Court's decision.

expertise.  The Debtor also indicated that he had a pressing need at the time to obtain the financial

records for the business quickly so that he could use them in connection with an upcoming alimony

hearing in which he  hoped to get the previously-ordered monthly alimony amount he was paying

to Wife  reduced.  Based on the additional information he was learning, Etzler concluded that he

needed to bring another professional into the matter.  He  asked another Skoda partner, Frank

Suponcic ("Suponcic"), to become involved because of his expertise in forensic accounting and

litigation support.  The Skoda billing records show that Suponcic's first involvement in the matter

was on April 3, 2017, when he participated in a telephone conference call with the Debtor and

Etzler.

Both Etzler and Suponcic continued to work on the matter through April and early

May.  It became apparent that major work would be needed to assist the Debtor.  He had almost no

financial records related to the business because Wife had taken the laptop on which she had kept

records (whatever they may have been) and was refusing to turn them over.  Furthermore, the

personal and business transactions of Debtor and Wife had been commingled in a single account.

The Debtor also did not know basic information such as the nature of the business entity, whether

it had any employees during the relevant time period, and whether payroll-related tax filings had

been made by Wife. Time was spent by Etzler and Suponcic getting answers to these types of

questions.

Around May 9, 2017, the Debtor supplied Suponcic with all the financial records he

had in his possession at the time, consisting of a box full of bank statements.  All the information

in those statements, comprising thousands of individual transactions that had occurred since 2011,

would need to be entered into an electronic database to create a general ledger for the business for the years 2011 through 2016. The creation of such a general ledger was a necessary precursor to preparing tax returns for those years, which had never been filed, and it would involve a massive data entry from the bank statements and other records. The Debtor also reported that his divorce hearing would be coming up in June and that he needed current income information to use at that hearing, which would involve business data from 2017.

Given the time sensitivity, the amount of the work that needed to be done to create the general ledger, and the lack of availability of any Skoda personnel who could devote full attention to such a project, Suponcic decided it would make sense to subcontract this part of the work out to someone else outside the firm who could do the work more quickly. The Skoda billing records indicate that Suponcic contacted Defendant Laura Page ("Page") on May 9, 2017, for that purpose, and an Independent Contractor Agreement between Page and Skoda was signed on May 10th calling for her to "reconstruct general ledgers from bank statements provided for the years (2011 - Present) on behalf of KB Directional and John Kent (Clients)" at a rate of $65 per hour.[3] *See*, Exhibit 2.

Page quickly commenced the project, even going so far as to begin the work while on a pre-planned family vacation. Her task was to enter all of the information from the bank statements into a Quick Books program and categorize each entry. The work was greatly complicated by the fact that business and personal transactions were commingled in the same

---

[3]

This arrangement also had an economic benefit to the Debtor because if in-house Skoda personnel had done the work their time would have been charged at $130 per hour.

account.  It was not always possible to determine whether a particular transaction was business or personal, and if business what category or "bucket" it fell into.  Page did the best she could with the information she had been provided, sometimes taking the initiative of conducting her own internet search to help determine the proper category for a transaction.  Those that could still not be determined with any reasonable certainty despite these efforts were put in an "ask my accountant" holding file for later follow-up.  As Page completed each year she would send her preliminary results to Suponcic and the two would then discuss any uncertainties and what additional information would be required from the Debtor to resolve them.  Page entered information from approximately 22,000 separate transactions during the course of the project, which gives some idea of its scope.

During the course of her work, Page regularly prepared and sent out invoices which itemized the time she had spent on various tasks and stated a "TOTAL DUE FOR SERVICES RENDERED," and a notice to "please remit payment upon receipt."  For instance, the first such invoice, Exhibit 3, reflected an amount due of $5,590 for time of 86 hours spent by Page through May 24, 2017 for such tasks as data entry for the years 2011, 2012, and 2013 and a number of telephone discussions with Suponcic.  The invoices are undated, but since each one indicates an end date for the time entries in the invoice, it is clear each must have been sent out shortly after its respective end date.  Page sent the invoices to Suponcic, who then forwarded them to the Debtor.[4] Page completed the large bulk of her work by the end of June 2017, though her work  continued

---

[4] It would be more accurate to say that Mrs. Kent  received the invoices in her capacity of providing office support for the KB Directional business while the Debtor was out in the field working.  There is no dispute that Mrs. Kent was acting as the agent of the Debtor, and that notice to her was notice to the Debtor.

6

thereafter on a much-reduced scale, with a final invoice in early August. The Parties stipulated that

the Debtor made the following payments with respect to the Page invoices:

- June 19, 2017 payment of $5,595
- June 19, 2017 payment of $1,950
- December 18, 2017 payment of $1,000

*See*, *Supplemental Consolidated Pretrial Narrative Statement/Stipulation* at ¶¶5-6, Doc. No. 33.

After Page was retained, Skoda personnel also continued work on the project. This

work was primarily done by Suponcic, though Etzler also performed some tasks and some work of

a more clerical nature was done by some other Skoda employees. Suponcic's efforts mainly

included review and follow-up on what Page was producing, communicating with the Debtor to

obtain additional information to address the gaps and uncertainties in the ongoing general ledger

creation, and contacting the IRS and making various filings with it to obtain information that would

be needed to clarify the Debtor's tax situation.[5] The first Skoda invoice that went out to the Debtor

was dated May 26, 2017, and showed a current amount due of $3,500 for work done through April

30, 2017. That invoice gave a general description of the work that had been done, but it did not

include a detailed time itemization such as the Page invoices did. Subsequent Skoda invoices

followed the same format as the first one.[6]

---

[5]

 Through discussions with the IRS Suponcic learned that no tax returns had been filed for the Debtor since 2007. He reported that the IRS was only concerned about the years 2011 and forward, so the Debtor apparently got a pass for not filing returns for 2008-2010. *See*, Ex. 23.

[6]

 The Skoda invoices appear in the record as Exhibits 11 through 16. It can be seen that each of the invoices includes as a second page a time itemization showing a date, name of timekeeper, detail of work, time, rate and amount for each item. It is not disputed that these second pages were not included with the original invoices that Skoda sent to the Debtor on or about the date indicated on each invoice. The itemization pages were not provided until March 15, 2019 in response to a request from Debtor's attorney.

At or about the same time that the first Skoda invoice went out, Skoda also sent out a proposed written agreement to the Debtor.  It is in the form of a letter from Skoda to the Debtor that is dated May 25, 2017, and signed by Etzler and Suponcic.  *See*, Ex. 1.  The Debtor signed the letter agreement on June 1, 2017, indicating his acceptance and returned it to Skoda.  When asked at trial the reason for the delay in obtaining a written agreement with the Debtor, Etzler testified that he had originally planned to obtain such an agreement when it looked like he would be the one spearheading the project, but that  once Suponcic became involved he deferred and left it to Suponcic to do so.  Suponcic testified that obtaining a written agreement was not a high priority given the urgency of the work due to concerns about taxes and the divorce litigation.

Suponcic credibly testified as to extreme frustration caused by the failure of the Debtor to respond to repeated requests to provide additional documents and information that were needed to complete the project.  This included, for example, copies of checks which were needed to identify the payee so that the payments could be properly categorized.  The Debtor, acting through Mrs. Kent, eventually provided copies of the checks for 2015 and 2016, but not for 2011 through 2014.  This was no small matter, as it meant there were 2382 missing checks representing nearly $1 million in transactions that could not be categorized.  The Debtor also failed to provide credit card statements that were needed to complete the general ledgers.  Another major missing item related to fixed assets of the business that needed to be properly accounted for before tax returns could be prepared and filed.  There were some $788,000 in such assets and in order to prepare a fixed asset schedule Skoda needed information as to when each item was placed in service, whether the item was purchased or leased, whether there was any corresponding debt, etc.  The Debtor never provided any of that information.

The requests for additional information from the Debtor were made primarily through e-mails. Although sent to the "John Kent" e-mail address, these would have been seen and addressed by Mrs. Kent who was functioning as the office person for the KB Directional business. Mrs. Kent did not recall seeing some of the e-mails, but as to the ones she did recall she acknowledged that none of the information that was being requested was ever provided to Skoda. *See*, Ex. 24 - 28. The end result was that the general ledgers could never be fully completed and tax returns could never be completed and filed.[7] The general ledger for 2015 and 2016 were closest to being completed, though they still had some holes in them due to open items, and those were the only two work product items supplied to the Debtor apart from some summaries prepared by Suponcic.

There was some disagreement as to how the relationship between the Parties ended. According to the Debtor, at some point he became concerned that Skoda was not performing the work it was supposed to be doing and he told them to stop. According to Suponcic the end for him was reached around August 22, 2017, because approximately 90 days had gone by since the real start of the project and the Debtor had not made any payments at all on the Skoda invoices and was

---

[7]

     The Debtor and Mrs. Kent both testified that following the termination of the relationship another accountant had to be hired and that accountant was able to prepare and file tax returns using only the same information that the Debtor had supplied to Skoda. The Court does not find this testimony credible. The other accountant was not identified and did not testify. The Court further notes that all of the tax returns were not filed until well after the bankruptcy case had been filed, and more than two years after the relationship between the Debtor and the Defendants ended. *See, e,g.*, main case Doc. Nos. 46 (a motion to dismiss for failure to have filed tax returns filed by the IRS on February 7, 2019), 102, 135 (status report filed on December 16, 2019 indicating all returns had finally been filed). This indicates that the return filings was not the simple task that Debtor and Mrs. Kent tried to portray.

also significantly behind on the Page invoices. He testified that he could not justify to his partners

continuing to work in these circumstances, particularly given the Debtor's financial track record that

had brought him to Skoda in the first place. Suponcic's last billing entry was for August 15, 2017.

Etzler had a few time entries after that, with the last one occurring on October 24, 2017. The Parties

have stipulated that the Debtor made one payment to Skoda in the amount of $20,000 on October

17, 2017.

### *DISCUSSION*

An initial point for background consideration is which law to apply in deciding this

matter. The Debtor argues that the law of Pennsylvania should apply, while the Defendants argue

for Ohio law. Because this Court sits in Pennsylvania, it must apply Pennsylvania choice of law

rules in making that decision. *See, e.g., In re Jones,* 604 B.R. 443, 465 (Bankr. W.D. Pa. 2019)

(citing, *In re SemCrude L.P.*, 864 F.3d 280 (3d Cir. 2017)). Pennsylvania choice of law rules require

the Court to first identify whether there are any relevant differences between the laws of the two

states since, if there are none, no real conflict exists and the Court may refer to the laws of the two

states interchangeably. *Jones, supra,* (citing *In re Prithvi Catalytic, Inc.*, 2015 WL 1651433 *7

(Bankr. W.D. Pa. April 6, 2015)). If a conflict is found to exist, then the Court must examine the

interests and policies of both Pennsylvania and Ohio to determine the nature of the conflict and the

extent to which one state has a greater interest in applying its law to the matter. *Id.* The Court will

keep these principles in mind in deciding each of the counts in the Complaint.

### *(A)   Unjust Enrichment and Conversion, Counts II and IV*

Turning then to the substance of the relief which Debtor is seeking, the Court first finds that two of the four counts of the Complaint can be quickly disposed of under this choice of law procedure without needing to decide between the laws of the two states because there is no conflict between them, and because the applicable law is such that the two counts must be denied.

First, Count II of the Complaint is a claim for unjust enrichment.  However, the Complaint also alleges that there was a contract between the Parties, *see* Complaint at ¶17, Doc. No. 1, and in fact the Parties have stipulated to the existence of such a contract, *see* Supplemental Consolidated Pretrial Narrative Statement/Stipulation at ¶1, Doc. No.  33.  It is the law in both Pennsylvania and Ohio that claims of unjust enrichment and breach of contract are mutually exclusive, such that if the parties are in a contractual relationship a claim for unjust enrichment may not be maintained.  *See, e.g., Howard Concrete Pumping Co., Inc. v. Peak Innovations, Inc.*, 2018 WL 4057388 at *4 (Pa. Super. Ct.,  Aug. 27, 2018) (a cause of action for unjust enrichment arises only when a transaction is not subject to a written or express contract, applying Pennsylvania law), and  *Watershed Mgt., L.L.C. v. Neff*,  2012 WL 832829 *4 (Ohio Ct. Appeals, 4th Dist., March 8, 2012) (once trial court found that a contract existed between the parties a claim for unjust enrichment became moot, applying Ohio law).  Thus, the unjust enrichment claim in Count II will be dismissed.

Second, Count IV of the Complaint is a claim for conversion, with the allegation being that the Defendants "have committed the common law tort of conversion by keeping the amounts paid to them by Plaintiff and by refusing to turnover the work product for which Debtor

made payment." Complaint at ¶32. Both Pennsylvania and Ohio law recognize that a claim for breach of contract may not be recast as a tort claim for conversion if the success of such conversion claim would rely entirely on duties arising from the parties' contractual relationship. Under Pennsylvania law this concept falls under the rubric of the "gist of the action" doctrine. *See, e.g., Mun. Auth. of Westmoreland Cty. v. CNX Gas Co., L.L.C.*, 380 F. Supp. 3d 464, 478 (W.D. Pa. 2019) (when entitlement to the property at issue is predicated solely on the terms of a contract, the gist of the action doctrine will bar a conversion claim for that property, applying Pennsylvania law). Ohio law reaches the same result, although the terminology of "gist of the action" is not necessarily adopted. *See, e.g., Misny & Associates Co., L.P.A. v. Aylstock, Witkin, Kreis & Overholtz, PLLC*, 2016 WL 5231807 *3-4 (N.D. Ohio, Sept. 21, 2016) (Ohio law holds that the existence of a claim sounding in contract generally excludes recovery under a theory of tort; where the conversion claim was merely a re-stated breach of contract claim it was dismissed). In the present case, Debtor made payments to the Defendants pursuant to the contract, and the work product which has not been turned over by the Defendants was produced pursuant to the contract. It is therefore clear that the conversion claim must be dismissed under the laws of both Pennsylvania and Ohio.

The above thus whittles the Complaint down to but two claims, breach of contract under Count I and turnover under Count III. The Court will consider theses claims in turn.

### *(B) Breach of Contract, Count I*

Before going into an analysis of the breach of contract claim per se, the Court must deal first with the undisputed fact that, as Debtor has noted, much of the work was done by the

Defendants prior to June 1, 2017, the stipulated date of the Parties' written agreement.  In fact, the

Page invoices found at Exhibits 3 and 4 show that $7,540 of her billed time occurred prior to June

1st, and the Skoda invoices found at Exhibits 10-12 show that perhaps more than $10,000 of its time

occurred prior to June 1st.[8]

At trial Etzler testified that he originally thought he would be handling the matter and

had intended to prepare an engagement letter agreement, but that before he did so he realized that

it would be more of a forensic accounting and litigation support matter that Suponcic should handle,

and that Suponcic should therefore be the person to create the agreement.  Suponcic in turn credibly

testified that the preparation and execution of a written agreement was delayed because of the

urgency of the work that the Defendants were performing on behalf of the Debtor with respect to

the  important upcoming hearing in Debtor's divorce case in which he  hoped to use information the

Defendants would be preparing to secure a reduction in the amount of alimony  he was required to

pay his Wife.  Thus, according to Suponcic,  the Defendants were focused on doing the necessary

work as quickly as possible, with a lower priority given to securing a written agreement.

---

[8]

    Exhibit 10, a Skoda invoice dated May 26, 2017 for $3,500 consists entirely of time before June 1st.  Exhibit 11, a Skoda  invoice dated June 13, 2017 for $5,000, also consists entirely of time before June 1st, as revealed on the attached itemization page, even though the invoice itself refers (apparently by mistake) to work from May 1, 2017 through June 10, 2017.  Exhibit 12, a Skoda invoice dated June 29, 2017 for $8,500 consists partly of work done prior to June 1st and partly of work done afterward, again as revealed on the attached itemization page, and again even though the invoice itself refers, apparently by mistake, to work from June 10th through June 30th.   The itemization page for Exhibit 12 shows total work  time amounting to $9,571, of which $2,041.20, or approximately 21.3% was from before June 1st.  Skoda discounted the June 29th invoice down to $8,500, though without attempting to attribute the discount to any specific time entries on the itemization. If the 21.3% figure is applied to the discounted $8,500 billed amount, that would result in approximately $1810 of the Exhibit 12  invoice being for pre-June 1st time.  The total billed Skoda time for pre-June 1st work would thus be $10,310 ($3,500 + $5,000 + $1,810).

The end result was that the preparation and execution of a written agreement between the Debtor and Skoda was delayed by perhaps two months from when, ideally, it should have been done.  The question is whether such delay is of any legal significance.  It is not entirely clear, but Debtor seems to be arguing that all of the work the Defendants did that predated his execution of the June 1st written agreement cannot be part of the Parties' contract.  If so, the Court rejects such argument.  It is clear that even prior to the June 1st date the Parties had an ongoing relationship that concerned the same subject matter as is set forth  in the June 1st written agreement.  Debtor acknowledged having had meetings with Suponcic and Etzler prior to June 1st to discuss the work Skoda was doing for him, and he was aware that Skoda  was hiring Page to assist with that work, and that he would be responsible for her billings.  The Court finds that the June 1st written agreement was therefore simply a confirmation and memorialization of a contractual relationship that was already ongoing.

The pre-June 1st contractual relationship between the Parties was in effect ratified by the Debtor and converted into a more formal express written contract when he knowingly and voluntarily signed the written agreement presented to him by Skoda.  Given that conclusion, it is probably not necessary to make a determination as to the exact nature of the pre-June 1st contractual relationship, but the Court would note that the evidence presented would support a conclusion that, at the very least,  the Parties had an implied in fact contract before they reduced their agreement to writing, something recognized under both Ohio and Pennsylvania law.  *See, e.g., Stepp v. Freeman*, 694 N.E.2d 510, 514 (Ohio App. 1997) (in an implied in fact contract the parties' meeting of the minds is shown by the surrounding circumstances, including the conduct and declarations of the

parties from which it can be inferred that a contract exists as a matter of tacit understanding);
*Dittman v. UPMC*, 154 A.3d 318, 325 (Pa. Super 2017) ( an implied contract arises when the parties agree on the obligations to be incurred, but their intention, instead of being expressed in words, is inferred from their acts in the light of the surrounding circumstances; implied contracts arise under circumstances which according to the ordinary course of dealing, and common understanding, show a mutual intent to contract).

The circumstances in the present case leave no doubt but that the Parties intended all along to contract.  Barring perhaps some unusual situation such as a familial relationship or a charitable context, neither of which is present here, it is well understood that a request for professional services is accompanied by a promise and expectation that payment will be made in return.  Thus, what may have started out as a contract implied in fact[9] eventually led to the June 1st written agreement.  By signing that agreement without protest or objection the Debtor confirmed that it accurately stated the terms of his ongoing agreement with Skoda, including his agreement to pay for all the services rendered in connection with the Parties' contractual relationship, not just those that had yet to be provided at the time the written agreement was signed.[10]  Put another way,

---

[9]
The Court would also note that there would not seem to be a statute of frauds or regulatory impediment under either Ohio or Pennsylvania law to an alternative finding that the Parties entered into an enforceable express oral contract prior to June 1st that was subsequently confirmed in the written agreement.  Given its finding that at the very least the Parties had entered into an implied in fact contract prior to June 1st, the Court need not pursue the alternative possibility of an oral contract any further.

[10]
The Debtor's subsequent voluntary payment for work done prior to June 1st is further confirmation of the effect of the written agreement.

15

the Court finds that the June 1ˢᵗ written agreement must  be given retroactive effect to encompass and govern the entire course of the Parties' relationship.  Having reached that conclusion, the Court may now move on to consider the Debtor's contention in Count I that the Defendants breached the contract.

The Debtor's essential allegations as to the breach of contract claim are encapsulated in the following three paragraphs from his Complaint:

> 17.  Debtor and Defendants entered into a contract on or about June 1, 2017 to organize Debtor's financial records and assist him with advisory and tax compliance matters.  (*See* Exhibits A & B).
>
> 18.  Debtor paid certain amounts over to Skoda and Page in performing under the contract.
>
> 19.  Skoda and Page have failed to perform their end of the contract by their refusal to produce any work product or any invoices to prove how his payments for these services were expended. Therefore, Skoda and Page have breached the contract between them and Debtor.

Complaint, Doc. No. 1 at ¶¶17-19.  At trial, and in his final argument, Debtor expanded on these allegations somewhat by pointing out that (a) much of the work done by the Defendants for which the Debtor  made payments was actually done prior to his signing of the written contract on June 1, 2017, and (b) the Defendants billed him for time spent on his 2017 taxes, something that was not part of the written agreement.  Additional point (a) was already covered above, with the Court finding against the Debtor, and additional point (b) is addressed below.

The Defendants' response to the breach of contract claim focuses on two arguments. First, that to the extent the Defendants failed to complete work for the Debtor as was envisioned in the contract, it was solely due to the Debtor's failure to provide the Defendants with the materials that they needed to do so. Second, that the Debtor, having voluntarily made payments to them under the contract totaling $28,540 after having received billing invoices from the Defendants, may not now seek to recover such payments by claiming a breach of contract.

As a starting point in considering the breach of contract claim the Court must determine whether there are any relevant differences between the laws of Pennsylvania and Ohio, and if so which state's law should apply. The Court asked the Parties to brief that issue and they both agree that there is a difference in that, while Pennsylvania and Ohio both share 3 common elements that must be shown to prove a breach of contract (existence of a contract, a breach by the defendant, and resulting damages), Ohio adds as a fourth element that the nonbreaching party performed its contractual obligations. *Compare, Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman, P.C.*, 635 Pa. 427, 445 (Pa. 2016), and *PRN Funding LLC v. Cole (In re Cole)*, 2015 Bankr. LEXIS 3494, *10 - *11, (Bankr. N.D. Ohio 2015). Defendants argue that this additional fourth element under Ohio law could be significant here because of its contention, as previously noted, that the Debtor failed to provide certain material that the Defendants had requested, and that such failure was in itself a breach of the contract by the Debtor. And indeed, the written agreement of the Parties does provide that:

> You [i.e., Debtor] agree to provide all financial and nonfinancial information and documentation reasonably deemed necessary or desirable by us in connection with the engagement.

*Ex. 1*, p. 2.

Even so, the Court is not convinced that there is an actual difference between Pennsylvania and Ohio law as to this "fourth element."  While Pennsylvania law may not explicitly recognize that a plaintiff must show that it performed its contractual obligations as one of the elements in a breach of contract claim, it reaches much the same result by its recognition of something known as the "prevention doctrine."  Under that doctrine:

> [i]f a promisor prevents or hinders the occurrence of a condition, or the performance of a return promise, and the condition would have occurred were [sic] the performance of the return promise been rendered except for such prevention or hindrance, the condition is excused.

*Utica Mut. Ins. Co. v. Cincinnati Ins. Co.*, 362 F. Supp. 3d 265, 270 (E.D. Pa. 2019) (quoting *16 Summ. Pa. Jur. 2d, Commercial Law §6.27* (2d ed.)).  *See also, e.g., Liddle v. Scholze*, 768 A.2d 1183, 1185 (Pa. Super 2001) (conduct of one party that prevents the other from performing is an excuse for nonperformance). Here, any failure of the Debtor to have provided necessary information to the Defendants can be viewed as a breach of contract by the Debtor, as well as a prevention or hindrance of the Defendants' ability to perform under the contract.  It thus appears that, what is an element of the Debtor's case for breach of contract under Ohio law, is in effect, at least in this case, an affirmative defense under Pennsylvania law, leaving as the only difference which side bears the burden of proof.

The Court  therefore need not choose between the law of the two states unless the evidence on this point is close and burden of proof may be significant.  That will not be necessary because the Court finds the evidence to be overwhelming that the Debtor did not provide all the

18

necessary information that was requested of him by Skoda, and that the failure of Debtor to provide

such information prevented or hindered Skoda from completing its work under the contract, thereby

excusing any breach of the contract by Skoda.

Suponcic testified very credibly to repeated communications that were made to the

Debtor and/or Mrs. Kent attempting to get them to provide information and documents that Skoda

needed in order to perform the work it had contracted to do.  This credible testimony was backed

up by documentary exhibits, including e-mails, that showed Skoda was seeking materials which the

Debtor could not, or would not, provide.  *See*, Exhibits 22-25, 27-28.  Suponcic also credibly

testified that it would have been a violation of Skoda's professional ethical obligations, and would

have exposed Skoda to the possibility of preparer liability, if it had filed any tax returns based only

on the limited material that Debtor did provide.  In the Court's view such concern was entirely valid.

The Court finds that Skoda did the best it could with the information that the Debtor

did provide.  Even assuming that Skoda failed to fully perform under the contract as the Parties had

envisioned when it was signed, such failure was solely the result of the Debtor failing to comply

with his obligation under the contract to provide all financial and nonfinancial information and

documentation deemed necessary or desirable by Skoda.[11]  The breach of contract claim therefore

fails whether analyzed under Ohio law, in that the Debtor has failed to prove an essential element

---

[11]

The Contract does not expressly include a "reasonableness" component with respect to the
Debtor's obligation to provide information and documentation as requested by Skoda.  If a
reasonableness standard is nevertheless implied, the Court would find that the requests for
information and documentation made by Skoda were reasonable and germane to the tasks it was
performing.

of the claim, or under Pennsylvania law, in that the Debtor's failure to provide information hindered or prevented Skoda's performance.

The Debtor's payment of invoices related to the contract provides an alternative basis for finding that the breach of contract claim must fail. As noted above, the Debtor was sent invoices for the work performed by Page and by Skoda, *see* Exhibits 3-4, 8, 10-16, as well as Supplemental Consolidated Pretrial Narrative Statement/Stipulation at ¶4, Doc. No. 33. The Parties stipulated that the Debtor made the following payments with respect to these invoices:

- June 19, 2017 payment of $5,595 to Page
- June 19, 2017 payment of $1,950 to Page
- October 10, 2017 payment of $20,000 to Skoda
- December 18, 2017 payment of $1,000 to Page

*Id*. at ¶¶5-6. The total payments made by the Debtor thus total $28,545.[12]

These payments by the Debtor implicate the "voluntary payment doctrine."[13] As explained by one court recently:

---

[12]

The Court notes that if all the various invoices are totaled (including several invoices from Page that were part of the consolidated pretrial exhibit list but not introduced at trial), the amount claimed to be due from Debtor would be approximately $50,000.

[13]

As a technical matter of pleading the Defendants should have raised voluntary payment as an affirmative defense in their answer, but they failed to do so. *See, Webster v. LLR, Inc*., 2018 WL 10230741 (W.D. Pa. August 20, 2018). Although the Defendants did not plead voluntary payment as an affirmative defense, they alleged the fact of the payments in their answer, *see* Doc. No. 6 at ¶¶7-9, the Parties stipulated to the payments prior to trial, *see* Doc. No. 33 at ¶¶5-6, and the effect, if any, of the payments was raised during the trial and in post-trial briefing. The Court therefore finds the voluntary payment issue to have been tried by consent. *See, e.g., Fed.R.Bankr.P. 7015,* incorporating *Fed.R.Civ.P. 15(b)(2).*

"The voluntary payment doctrine is a form of estoppel." ... Under the voluntary payment doctrine, "'one who has voluntarily paid money with full knowledge, or means of knowledge of all the facts, without any fraud having been practiced upon him ... cannot recover it back by reason of the payment having been made under a mistake or error as to the applicable rules of law.'" ... As such, "'money paid voluntarily, although under a mistake of law as to the interpretation of a contract, cannot be recovered.'" ... Conversely, the voluntary payment doctrine does not apply and a party can recover payments where the payments were made "without full knowledge of the facts, or because of the other party's fraud, or under some type of duress ....".

*Takeda Pharm. U.S.A., Inc. v. Spireas*, 400 F. Supp. 3d 185, 218–19 (E.D. Pa. 2019)(citations omitted).  The voluntary payment doctrine is recognized under Ohio law as well:

Ohio recognizes the voluntary payment doctrine. "As articulated by the Ohio Supreme Court: 'In the absence of fraud, duress, compulsion or mistake of fact, money, voluntarily paid by one person to another on a claim of right to such payment, cannot be recovered merely because the person who made the payment mistook the law as to his liability to pay.'" ... [plaintiff/appellant] contends that the contract breach claim still stands because the voluntary payment doctrine does not apply where a party breaches a provision of a written contract. He urges that, because he interprets [defendant/appellee's] actions as a breach of the contract, the doctrine does not apply. He is mistaken: "A payment made by reason of a wrong construction of the terms of a contract is not made under a mistake of fact, but under a mistake of law, and if voluntary cannot be recovered back." ...

*Salling v. Budget Rent-A-Car Sys., Inc*., 672 F.3d 442, 444–45 (6th Cir. 2012)(citations omitted).

All of the elements necessary to apply the voluntary payment doctrine are present here.  The Debtor made the payments to the Defendants voluntarily.  There was no suggestion that the Debtor was acting under any kind of duress or compulsion when the payments were made.  The

21

Debtor was also fully aware of the facts when the payments were made.  He had been provided with invoices showing the work that the Defendants were doing.  Particularly with regard to the $20,000 payment made to Skoda in October 2017 and the $1,000 payment to Page in December 2017, those came well after the Debtor claims to have begun to have concerns about the work that the Defendants were  performing.

The Debtor tried to make much of the fact that the Skoda invoices which he received in 2017 only had the total amount due and a general description of the work that was done, without the accompanying detailed time entries for each of the persons whose work time was incorporated into the invoice.  However, Suponcic and Etzler both  credibly testified that if the Debtor had ever asked for that additional information it would have been provided to him – testimony whose credibility was further confirmed by the fact that in 2019 in the months leading up to the filing of this adversary proceeding, when Debtor's attorney asked for such detailed time entries they were provided to him without opposition.  *See*, Exhibit 30.  Thus, to the extent it could be said that the Debtor did not actually have "full knowledge" at the time he made the payments, he certainly at least had the means to obtain such knowledge,  but he chose not to do so.

There was also no evidence that the Debtor was the victim of any sort of fraud by the Defendants in connection with any of the payments that he made.  The Debtor did not make any allegations of fraud in his Complaint.  At trial the Debtor did attempt to show that the detailed time entries that Skoda provided to his attorney in 2019 were false, after-the-fact creations designed to justify the billing amounts stated in the invoices, which might be likened to a species of fraud.  That still does not help the Debtor avoid the consequences of his voluntary payments for two reasons.

First, the Court finds that the evidence does not support the Debtor's contention regarding the detailed time entries.  The evidence instead satisfies the Court that the detailed time entries were from contemporaneously kept records of the timekeepers.  Second, even assuming that the Debtor had been able to convince the Court of his theory regarding the detailed time entries, any 'fraud" which Skoda would thereby have committed would have occurred well after the Debtor had made his voluntary payments on the contract, and it could thus not possibly have been a cause of such payments.

For all these reasons the Court finds that the voluntary payments that the Debtor made to the defendants also defeat his breach of contract claim. [14]

### (C)  *Turnover, Count III*

In Count III of the Complaint the Debtor alleges that the Defendants are wrongfully holding the "completed financial records and tax preparation documentation" that were created

---

[14] The Debtor also raised two other issues regarding the breach of contract claim that the Court will address briefly before moving on.  First, he argued that Skoda should not have had to make any requests for payroll information from the IRS because he did not have any employees during the period of 2011 through 2016.  Given the Debtor's uncertainty about the status of his business and its finances, however, the Court finds that it was prudent for Skoda to make such inquiries, and in fact that they did turn up evidence of potential payroll issues.  *See*, Ex. 23.  Furthermore, the Debtor signed the forms that were submitted to the IRS and should not now be heard to complain they were unnecessary.  Finally, the Debtor argued that the attempted creation of a general ledger for the first half of 2017 was beyond the scope of the contract.  Suponcic credibly explained that was done in connection with the Debtor's request for assistance with respect to the divorce alimony  hearing which would require current income information, and the Court agrees that the scope of the contract language is worded broadly enough to include such information about 2017.  The relevant language provides "Skoda Minotti will provide litigation advisory services to you and KB.  The professional consulting services to be rendered will include, among others: ... assist with any litigation or accounting matters related to your domestic relations matter."  There is also no avoiding the fact that the Debtor provided 2017 bank statements to Skoda so he apparently understood they were necessary for the work that was to be done.

pursuant to the contract, and that the Defendants should be compelled to turn such materials over to him pursuant to the following provision of the *Bankruptcy Code*:

> (e) Subject to any applicable privilege, after notice and a hearing, the court may order an attorney, accountant, or other person that holds recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs, to turn over or disclose such recorded information to the trustee.

*11 U.S.C. § 542(e).*

The Defendants have previously returned to the Debtor all of the original source material he provided to them, and they did provide the Debtor with two years worth of general ledger financial records prepared by Page (although in a format other than QuickBooks which Debtor says makes the records unuseable for him), and some summaries. Beyond that, however, the Defendants have refused to provide the Debtor with any of the considerable work product that must have been prepared by them under the contract.

At the final argument the attorney for the Defendants attempted to excuse this lack production by arguing that there were still invoices that the Debtor has not paid,[15] and that therefore the Defendants were under no obligation to turn the work product over to the Debtor. The Defendants thus appear to be relying on the following provision in the June 1st written agreement:

---

[15] The Court notes that the Defendants did not file a proof of claim in the bankruptcy, did not assert a counterclaim for nonpayment/breach of contract against the Debtor when they filed their Answer to his Complaint, and did not assert any alleged non-payment by the Debtor as a set-off or affirmative defense. On the other hand, the Debtor did list Skoda in his Schedule F as a general unsecured creditor with a claim in the amount of $21,925.50 for "Fees." That is very close to the number that would be expected if one takes the approximately $50,000 total amount of the Defendants' invoices (see footnote 12, *supra*), less the $28,545 amount that the Debtor has paid.

> We [Skoda] reserve the right at our sole discretion to suspend the provision of services without liability, as well as withhold communication of the results of our analysis or the delivery of work product, analysis, reports or testimony until we have been paid in full for our services.

*Ex. 1.*[16]

There appears to be a conflict between *Section 542(e)* and the provision in the Parties' agreement, and the Court must determine which shall prevail. *Section 542(e)* was designed to prevent attorneys and accountants from coercing debtors to pay their claims in full ahead of other creditors. *See, e.g., In re Hotels Nevada, LLC.,* 458 B.R. 560, 567 (Bankr. D. Nev. 2011). The legislative history to *Section 542(e)* provides that it:

> ... deprives accountants and attorneys of the leverage that they have today, under State law lien provisions, to receive payment in full ahead of other creditors when the information they hold is necessary to the administration of the estate.

5 *Collier on Bankruptcy* at ¶542.06[1] (quoting H.R. Rep. No. 595, 95th Cong., 1st Sess. 369-70 (1977)).[17]  *Section 542(e)* applies regardless of whether the material in question is property of

---

[16]

The "Independent Contractor Agreement" between Skoda and Page also provides: "Neither Page nor Skoda will release any work product, including the original QuickBooks files, to Client unless Client's account has been paid in full to both service providers." *Ex. 2.*

[17]

For the sake of completeness, it should be noted that there is authority to the effect that, when a professional is required under *11 U.S.C. Section 542(e)* to turn over materials on which a retaining lien is held, such lien must be valued and the professional compensated in some way, for example by being given an administrative claim or some other form of adequate protection. *See, e.g., In re Olmstead Utility, Inc.,* 127 B.R. 808 (Bankr. N.D. Ohio 1991). In this particular instance, as was previously mentioned, the Defendants have done nothing to indicate they claim to have any such lien interest in the materials the Debtor is seeking. To reiterate, the Defendants have not filed a proof of claim, they did not assert anything in their Answer about holding a lien, and they did not assert any sort of counterclaim raising the existence of a lien. For this reason the Court sees no need to consider any further the issue of a possible retaining lien in connection with the turnover.

the bankruptcy estate. *See, e.g., In re American Metrocomm Corp*., 274 B.R. 641, 652 (Bankr. D. De. 2002).

It thus is clear to the Court that *Section 542(e)* trumps any state-law based right that the Defendants have to withhold their work product from the Debtor as long as the Court finds that such work product is needed to assist with the administration of the estate. It is also clear that the record is devoid of any valuation evidence regarding the work product materials held by Defendants. The Court therefore finds that the work product materials being held by the Defendants would be at least helpful to the Debtor in the administration of the estate and in the continued successful functioning of the business which is the source of the Debtor's income and the funding for the plan. Accordingly, it will order a turnover of the work product.[18]

## CONCLUSION

The Court finds in favor of the Defendants on the breach of contract claim because the Debtor failed to comply with his duty to provide the Defendants with the materials they needed to complete the work for which they were hired, and also because the voluntary payments made by the Debtor to the Defendants under the circumstances presented prevent him from succeeding on a breach of contract claim. As such, the claims for unjust enrichment and conversion

---

[18] In furthering its "completeness approach," the Court notes here that its decision with respect to the turnover was also influenced by the testimony of Suponcic at trial who, when asked why the work product had not been turned over, stated that the Debtor had never asked for it, thus implying that if such a request had been made the material would have been turned over. Subsequently, upon a direct question by the Court as to whether the work product materials would have been provided to the Debtor if he had asked for it, Suponcic answered in the affirmative.

will be dismissed as incompatible with the Debtor's breach of contract claim.  Finally, the Court will

order the Defendants to turn over the work product they prepared to the Debtor.  An appropriate

order follows.

Dated: May 5, 2020                                    Thomas P. Agresti, Judge
                                                     United States Bankruptcy Court

Case administrator to serve:
        Brian Thompson, Esq.
        Matthew Pomy, Esq.
        Debtor